AO 106 (Rev. 04/10) Affidavit for Search Warrant | AUSA Maureen E. Merin, (312) 353-1457
AUSA Jessica R. Ecker, (312) 353-1079

FILED
4/29/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
TD

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| In the Matter of the Search of: | Case No. 26M310 |
| The cellular telephone, further described in Attachment A | Ref. No. 2023R00323 |

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Jon Molidor, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A**

located in the Northern District of Illinois, there is now concealed:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Sections 1201(c) and 1951(a) | conspiracy to commit Hobbs Act robbery and kidnapping |

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

/s/ Jon Molidor (MDW with permission)
_____
*Applicant's Signature*

JON MOLIDOR, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives
*Printed name and title*

Date: April 29, 2026 _____

*Judge's signature*

City and State: Chicago, Illinois _____

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                )
NORTHERN DISTRICT OF ILLINOIS   )

## **AFFIDAVIT**

I, Jon Molidor, being duly sworn, state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. I have been so employed since approximately January 2024.

2.      As part of my duties as an ATF Special Agent, I investigate violations of the Gun Control Act of 1968, National Firearms Act of 1934, and other federal firearms statutes relating to the unlawful use, possession, and trafficking of firearms, as well as violent offenses committed using firearms. In conducting these investigations, I have used a variety of investigative techniques and resources. Through these investigations, my training and experience, and conversations with other special agents and law enforcement personnel, I have become familiar with methods used by criminals to communicate together and safeguard their illegal activities. In addition, I have received training in the history of firearms laws and regulations, firearms criminal violations, interstate controls, firearms identification, and investigative call/social media analysis. I have also participated in investigations that have led to the issuance of search warrants involving violations of firearms laws. These warrants involved the search of locations including residence of targets, their associates and relatives, cellular phones, and computers. Evidence searched for and recovered in these locations has included firearms, controlled substances, records pertaining to the expenditures and profits realized therefrom. I have also participated

in the execution of multiple federal search warrants, including search warrants for cell phone devices and cell phone location information.

3.      This affidavit is made in support of an application for a warrant to search,a black Apple iPhone cellular telephone, answering to telephone number 312-697-9027 ("the **Subject Phone**") for evidence and instrumentalities described further in Attachment B, concerning conspiracy to commit Hobbs Act robbery and kidnapping offenses, in violation of Title 18, United States Code, Sections 1201(c) and 1951(a)(the "**Subject Offenses**").

4.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of the **Subject Offenses** are located within the **Subject Phone**.

## I.      FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONE

5.      As explained below, on April 28, 2026, ATF arrested TYRESE FENTON-WATSON for conspiracy to commit Hobbs Act robbery and kidnapping, in violation of Title 18, United States Code, Sections 1201(c) and 1951(a). On FENTON-WATSON's person, law enforcement recovered the **Subject Phone,** which is presently in the custody of ATF in Chicago, Illinois.

2

### A.    Summary

6.    In summary, as set forth in more detail below, on or about March 8, 2026, TYRESE FENTON-WATSON conspired with Isaiah Dukes, Khiell Dukes, Jalen Chambers, Dashun Brown, David Franklin, Anthony Ramsey and others (collectively, the "Co-Conspirators") to commit kidnapping and Hobbs Act robbery. Brown, Franklin, Ramsey, I. Dukes, K. Dukes, and Chambers have been charged by superseding indictment with these offenses. *United States v. Brown, et. al.*, 26 CR 117.

7.    A description of the robbery and kidnapping is set forth in more detail in Exhibit A, the criminal complaint and affidavit submitted in support of charges against I. Dukes, K. Dukes, and Chambers. As set forth in that complaint, five men, including Brown, Franklin, and Chambers, forced entry into a residence in Winnetka, Illinois (the "Winnetka Residence"), while Ramsey, I. Dukes, K. Dukes, and other co-conspirators waited nearby and communicated with the Co-conspirators in the Winnetka Residence concerning their plan to rob the Winnetka Residence of cryptocurrency. The Co-conspirators in the house brandished firearms and attempted to rob Victim A of cryptocurrency that the Co-conspirators believed was present in or otherwise accessible from the Winnetka Residence. The Co-conspirators in the Winnetka Residence physically restrained Victim B, who was the only occupant in the residence, held Victim B at gunpoint, and demanded that Victim B give the Co-conspirators access to the safe, a computer, and online accounts holding

3

cryptocurrency. Victim B later escaped, and the Co-conspirators fled, taking with them several items from the Winnetka Residence.

8. As set forth in more detail below, TYRESE FENTON-WATSON, the user of the **Subject Phone**, has been identified as one of the five co-conspirators who entered the Winnetka Residence and committed the robbery and kidnapping.

**B. Tyrese FENTON-WATSON and Subject Phone 8**

9. Law enforcement identified the Subject Vehicle used by the Co-conspirators to travel to and from the Winnetka Residence. *See* Ex. A at ¶¶ 10, 14. The Subject Vehicle was stolen during the early morning hours of March 2, 2026. *Id.* at ¶ 14. Co-conspirator Dashun Brown was captured on McDonald's surveillance video driving the Subject Vehicle in the early morning hours of March 11, 2026. *Id.* at ¶ 16. The vehicle was recovered by ATF later that day. *Id.* at ¶ 14.

10. Law enforcement subsequently extracted information from the infotainment system of the Subject Vehicle. According to that information, on March 9, 2026, at approximately 12:12 a.m., a device with the Bluetooth MAC address "8C08AA284D09" connected with the Subject Vehicle. According to records obtained from Apple, via subpoena, this Bluetooth MAC address is associated with a device with the Apple ID abolilreese@icloud.com and registered to "Tyrese Fenton-watson" with the telephone number for the **Subject Phone**.

11. Law enforcement arrested FENTON-WATSON on April 28, 2026, in Chicago, Illinois. At that time, FENTON-WATSON was in possession of **Subject**

4

**Phone 8** and also had a Springfield XD45 semi-automatic handgun on his person. In a *Mirandized* and recorded interview with agents following his arrest, FENTON-WATSON admitted that **Subject Phone 8** was his phone.

12.     According to publicly available records from Venmo, the phone number associated with **Subject Phone 8** is associated with the PayPal account with the name "Tyrese Fenton-watson." Further, according to records obtained from PayPal, Subject Phone 8 is registered to an account owned by FENTON-WATSON which was created on March 14, 2026, using FENTON-WATSON's date of birth and Social Security number.

13.     According to the Illinois Department of Corrections (IDOC), FENTON-WATSON is currently on parole for a previous conviction. Further, FENTON-WATSON has used the **Subject Phone** to contact IDOC. Specifically, on March 3, 2026 and March 12, 2026, FENTON-WATSON called IDOC using the **Subject Phone**, but the calls went unanswered.  On March 15, 2026, IDOC called the **Subject Phone**, but the call went unanswered. On April 8, 2026, FENTON-WATSON used the **Subject Phone** to check in with IDOC.

14.     Law enforcement received surveillance footage from various cameras around the Winnetka Residence. Based on my review of the surveillance footage, you can see a black male, wearing a black hooded sweatshirt, grey pants, a black mask, and grey shoes enter the Winnetka Residence (*Figures 1 & 2*). *See* Ex. A at ¶ 10.

5



*Figure 1*



*Figure 2*

15.     Law enforcement also identified the Instagram account "abo_lilreese" as associated with FENTON-WATSON based on a comparison of photos posted on the account and a Chicago Police Department booking photo of FENTON-WATSON. On

February 14, 2026, FENTON-WATSON posted a photo of himself wearing a black shirt, black pants, and grey shoes (*Figure 3*). The grey shoes that FENTON-WATSON is wearing (*Figure 3*) appear to be the same shoes he wore during the March 8, 2026, armed robbery (*Figures 1 & 2*). Further, FENTON-WATSON's build matches that of the individual depicted in *Figure 3*.



*Figure 3*

16. Review of AT&T records shows that the user of the **Subject Phone** had the following activity before, during, and after the robbery and kidnapping at the Winnetka Residence:

a. On March 8, 2026, at approximately 3:57 p.m. (approximately 25 minutes before the robbery and kidnapping), the **Subject Phone** was located near a cell tower located near the intersection of Willow Road and Landwehr Road,

7

Northbrook, Illinois, which is approximately 6.7 miles away from the Winnetka residence.

b. On March 8, 2026, at approximately 4:26 p.m. (during the robbery and kidnapping), the **Subject Phone** was located near a cell tower located near the Winnetka Residence.

c. On March 8, 2026, at approximately 4:47 p.m. (during the robbery and kidnapping), a phone used by Khiell Dukes[1] received a phone call from the **Subject Phone**, while the **Subject Phone** was near a cell tower near the Winnetka Residence, that lasted approximately 9.5 minutes.[2]

d. On March 8, 2026, at approximately 5:25 p.m., the **Subject Phone** was located near a cell tower located near the intersection of Willow Road and Interstate 94, Northfield, Illinois, which is approximately 1.9 miles away from the Winnetka residence.

17. Based on my training and experience, and that of other law enforcement personnel and special agents, the **Subject Phone** being located near these locations

---

[1] Khiell Dukes is identified as the user of **Subject Phone 4** as follows: Khiell Dukes was arrested at a residence in Elgin, Illinois. **Subject Phone 4** was found in that residence, located in a second-floor bedroom that also contained, among other things, a plane ticket in Khiell Dukes' name for an April 1, 2026 flight from Fort Lauderdale, Florida, to Chicago, Illinois. In a post-arrest interview, he stated, in sum and substance, that **Subject Phone 4** belonged to him. In addition, Kheill Dukes' contact name is identified in FRANKLIN'S phone as "Bigfolks new line." Jewelry bearing the words "Big Folks" was recovered from the residence in which Kheill Dukes was arrested. Further, according to Khiell Dukes' criminal history, he is known to use the alias "Bigfolks."

[2] A prior affidavit inadvertently stated that Chambers's Phone (Subject Phone 5), rather than K. Dukes' Phone (Subject Phone 4), received a phone call from **the Subject Phone.**

before, during, and after the armed robbery is indicative of the fact that the user of the **Subject Phone** was located at these locations at the specified times.

18. Based upon my training and experience, I know that cellular phones may contain relevant evidence of the **Subject Offenses**, including text messages made or received from the **Subject Phone** that are located in the memory of the **Subject Phone**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the conspiracy to commit Hobbs Act robbery and kidnapping offenses. Moreover, digital photographs located in the memory of the **Subject Phone** may contain images of the tools or participants involved in the **Subject Offenses**. Moreover, digital photographs stored in the **Subject Phone** may contain images of the user of the **Subject Phone**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the **Subject Offenses**, and locations and instrumentalities used in committing the **Subject Offenses**.

19. In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the

9

cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

20.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

21.     In my training and my experience and in the experience of other agents with whom I have consulted, information concerning the geographic location of the user of the **Subject Phone** for a one-month period preceding the Subject Offenses,

10

and continuing until present, will provide information concerning the identity of the user of the account, locations frequented by the user of the **Subject Phone**, including locations where tools, proceeds, and other co-conspirators may be located, and the presence of the user of the **Subject Phone** at the time the Subject Offenses were committed. In addition, examination of computer data for a one month period preceding the Subject Offenses will provide information concerning the planning for the Subject Offenses.

22.     Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses commonly use cellular telephones as a means to communicate. In this case, as described above and in Exhibit A, individuals, including FENTON-WATSON, communicated regarding the **Subject Offenses** prior to, during, and after the robbery and kidnapping. Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phone** is associated with the target in this case, because there was telephonic communication between participants involved in the conspiracy to commit Hobbs Act robbery and kidnapping offenses, and because, in my experience and in the experience of other agents, defendants use telephones to contact

11

co-conspirators, there is probable cause to believe the **Subject Phone**, described further in Attachment A, contains evidence of violations of conspiracy to commit Hobbs Act robbery and kidnapping.

## II. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

23. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer

12

experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

24. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

25. In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

26. The warrant I am applying for would permit law enforcement to obtain from TYRESE FENTON-WATSON the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the **Subject Phone**. I seek this authority based on the following:

13

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that the **Subject Phone** offers users the ability to unlock the device through biometric features, namely, facial recognition features, in lieu of a numeric or alphanumeric passcode or password.

b. The **Subject Phone** is an Apple product with a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.

c. In my training and experience, users of electronic devices often enable the aforementioned biometric feature(s) because it is considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. The passcode or password that would unlock the **Subject Phone** is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

14

f. I also know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that the **Subject Phone's** biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. Thus, because the **Subject Phone** is a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. As discussed above, TYRESE FENTON-WATSON is the user of the Subject Phone, and, based on these facts and my training and experience, it is likely that his biometric characteristics are among those that are able to unlock the **Subject Phone**.

h. Due to the foregoing, the warrant I am applying for would permit law enforcement personnel to hold the device in front of the face of TYRESE FENTON-WATSON and activate the facial recognition feature for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## III.   PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

27. The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol.

15

28.     The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a.     examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c.     surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.     opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e.     using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

IV.     **CONCLUSION**

29.     Based on the above information, I respectfully submit that there is probable cause to believe that conspiracy to commit Hobbs Act robbery and

16

kidnapping offenses, in violation of Title 18, United States Code, Sections 1201(c) and 1951(a) , have been committed, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Phone**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Phone** more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

__/s/ Jon Molidor (MDW w/
permission)
Jon Molidor
Special Agent

Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to and affirmed by telephone this 29th day of April, 2026

Honorable M. DAVID WEISMAN
United States Magistrate Judge

17

## ATTACHMENT A

## DESCRIPTION OF ITEM TO BE SEARCHED

A black Apple iPhone, answering to telephone number 312-697-9027, currently in the possession of the ATF in Chicago, Illinois

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence and instrumentalities concerning violation of Title 18, United States Code, Sections 1201(c) and 1951(a) (the "Subject Offenses"), as follows:

1.      Items which evidence the identity of the user(s) of the **Subject Phone** between February 8, 2026, and present.

2.      Any items pertaining to firearms, ammunition, firearms parts and accessories.

3.      Any items pertaining to the planning, commission, and/or concealment of the Subject Offenses.

4.      Any items pertaining to the Winnetka Residence.

5.      Any items pertaining to the use, acquisition, and disposal of any stolen vehicles, any vehicles without license plates, a Cadillac Escalade ESV, and/or any Acura SUV or sedan.

6.      Any items pertaining to a hotel located at 495 Airport Road, Elgin, Illinois.

7.      Any items pertaining to financial transactions, and records identifying financial accounts, records of financial transactions, and records identifying bank accounts, digital currency wallets, or payment apps such as CashApp, which pertain to payment for, or proceeds of, the Subject Offenses.

8.      Records of communications, including telephone calls, voicemails, call history, text messages, instant messages, and social media messages, located in the

memory of the phone, that provides information regarding the identities of participants, co-conspirators, and witnesses to the Subject Offenses, as well as information regarding methods and means of the planning, commission and concealment of the Subject Offenses.

9.     Location information data located in the memory of the **Subject Phone** that provides information regarding the location or whereabouts of the **Subject Phone** between February 8, 2026, and April 28, 2026.

10.     Any items pertaining to the acquisition and transfer of cryptocurrency, to include cryptocurrency private keys, recovery seeds, and cryptocurrency ledger devices

11.     Any items pertaining to property reported stolen as a result of the March 8, 2026 robbery of the Winnetka Residence (the "Stolen Property").

12.     Items pertaining to the sale or disposition of the proceeds of the Subject Offenses.

13.     Names, aliases, and numbers stored in the **Subject Phone**, including the numbers associated with the phone and any number directory stored in the memory of the phone, that provides information regarding the identities of the participants and/or co-conspirators involved in the Subject Offenses.

14.     Images and video, and related data, pertaining to the (a) tools used in the planning, commission, and concealment of the Subject Offenses; and (b) the identity of the participants in, or witnesses to, the Subject Offenses.

2

15. Records pertaining to communication applications, including account name(s), subscriber information, and evidence pertaining to the identity of the user(s) of those applications.

16. Records pertaining to IP addresses and devices which accessed the **Subject Phone.**

17. Any SIM card located within the phone that helps to identify cellular tele-phone numbers associated with the phone.

Law enforcement personnel are authorized to hold the **Subject Phone** in front of the face of TYRESE FENTON WATSON and activate the facial recognition feature for the purpose of attempting to unlock the **Subject Phone** in order to search its contents as authorized by this warrant.

3

**ADDENDUM TO ATTACHMENT B**

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

# EXHIBIT A

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Maureen E Merin (312) 353-1457
AUSA Jessica R. Ecker (312) 613-5200

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ISAIAH DUKES,
    also known as "Zayy,"
KHIELL DUKES,
    also known as "Big Folks," and
JALEN CHAMBERS

CASE NUMBER:   26 CR 166
**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about March 8, 2026, at Winnetka, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1201(c) | Conspiracy to Commit Kidnapping |
| Title 18, United States Code, Section 1951(a) | Conspiracy to Commit Robbery Affecting Commerce |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

JON MOLIDOR
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>April 12, 2026</u>

*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>YOUNG B. KIM, U.S. Magistrate Judge</u>
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, JON MOLIDOR, being duly sworn, state as follows:

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed since approximately January 2024.  My current responsibilities include the investigation of criminal violations of law as they relate to federal firearms offenses, including the unlawful possession of firearms or ammunition by convicted felons, firearms trafficking, violent crime, and narcotics trafficking. I am currently assigned to the ATF Homeland Security Task Force (HSTF) Strike Force V.

2.     As part of my duties as a Special Agent, I investigate violent crimes, criminal violations relating to firearms, and firearms trafficking. My current responsibilities also include the investigation of violent gun crimes and the apprehension of violent fugitives. In addition, I have participated in numerous investigations that involve the illegal purchase, trafficking, possession, and use of firearms and ammunition during, and in relation to, crimes of violence.

3.     This affidavit is submitted in support of a criminal complaint alleging that ISAIAH DUKES, aka "Zayy," KHIELL DUKES, aka "Big Folks," and JALEN CHAMBERS have violated Title 18, United States Code, Sections 1201(c) and 1951(a) (the "**Subject Offenses**"). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging

ISAIAH DUKES, KHIELL DUKES, and JALEN CHAMBERS with conspiracy to commit kidnapping and Hobbs Act robbery, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

4. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and persons with knowledge of relevant facts, and my review of video surveillance, social media, and documents and records.

## I.  FACTS SUPPORTING PROBABLE CAUSE

5. In summary, and as set forth in more detail below, on or about March 8, 2026, ISAIAH DUKES, KHIELL DUKES, and JALEN CHAMBERS conspired with DASHUN BROWN, DAVID FRANKLIN, ANTHONY RAMSEY and other co-conspirators (collectively, the "**Co-Conspirators**") to commit kidnapping and Hobbs Act robbery.[1] On or about March 8, 2026, JALEN CHAMBERS, BROWN, FRANKLIN, and two other co-conspirators forced entry into a residence in Winnetka, Illinois (the "Winnetka Residence"), while RAMSEY, ISAIAH DUKES, KHIELL DUKES, and other co-conspirators waited nearby and communicated with the co-conspirators in the Winnetka Residence concerning their plan to rob the Winnetka Residence of cryptocurrency. Once inside the Winnetka Residence, JALEN CHAMBERS, BROWN, FRANKLIN, and two other co-conspirators brandished

---

[1] BROWN, FRANKLIN, and RAMSEY are charged by indictment with the commission of the **Subject Offenses**. *United States v. Brown, et al.,* 26 CR 117 (Cummings, J.)

2

firearms and attempted to rob Victim A of cryptocurrency that the **Co-Conspirators** believed was present in or otherwise accessible from the Winnetka Residence. The **Co-Conspirators** in the Winnetka Residence physically restrained Victim B, who was the only occupant in the residence, held Victim B at gunpoint, and demanded that Victim B give the **Co-Conspirators** access to the safe, a computer, and online accounts holding cryptocurrency. One of the **Co-Conspirators** also grabbed Victim C, who arrived at the Winnetka Residence after the **Co-Conspirators** had made entry. Victim B later escaped, and the **Co-Conspirators** fled, taking with them several items from the Winnetka Residence. JALEN CHAMBERS, BROWN, FRANKLIN, and the other co-conspirators who fled from the Winnetka Residence, then met up with ISAIAH DUKES, KHIELL DUKES, RAMSEY, and others after the robbery, during which RAMSEY and the additional co-conspirators searched the co-conspirators that had fled from the Winnetka Residence for proceeds of the robbery.

### A. March 8, 2026 Robbery and Kidnapping

6. On or about March 8, 2026, according to my review of Winnetka Police Department (WPD) reports, Victim A called WPD to report an armed robbery at the Winnetka Residence, which was Victim A's home.

7. WPD, and later, WPD and federal law enforcement, interviewed Victim B, who also resided at the Winnetka Residence, who told law enforcement the following, in summary and not verbatim:

a. Shortly after 4:10 p.m., a group of individuals arrived at the Winnetka residence in a black SUV (the "**Subject Vehicle**"). Victim B then heard

3

the doorbell ring. Victim B answered the door and observed a black male (Subject One) holding a brown paper bag. Victim B reported that Subject One briefly posed as a food delivery driver before forcibly entering the residence. Subject One was immediately followed by four other subjects, who exited the **Subject Vehicle** and forcibly entered the residence, pushing Victim B in the process. Victim B explained that the subjects pointed firearms at him/her and one of them kicked him/her in the groin. Victim B described the subjects as black males, wearing face masks, dark colored hooded sweatshirts, and gloves. Victim B noted that one of the subjects (Subject Two) was wearing glasses. Victim B stated that at least four of the subjects carried guns.

b.      Once the subjects were inside the Winnetka Residence, Victim B observed Subject Two on a phone call with an unknown individual (Subject Seven). Victim B reported hearing Subject Seven on the phone instructing the subjects in the residence to ask for the locations of laptop computers, cryptocurrency ledgers, and passcodes. The subjects demanded to know the location of any laptop computers, and Victim B admitted that a laptop computer was in the kitchen. One of the subjects grabbed the laptop and demanded that Victim B give him the password. Victim B stated that he/she did not know the password and was unable to provide it. Subject Two then directed two of the subjects to go outside and move the **Subject Vehicle** to the roadway. The remaining subjects continued to demand to know where the laptops, cryptocurrency ledgers, and passwords were in the residence.

4

c. One of the subjects then asked Victim B if there was a safe in the Winnetka Residence. Victim B initially said "no," but as the subjects held him/her at gunpoint, he/she subsequently relented and said, "yes." The subjects then directed Victim B at gunpoint to an upstairs closet. The subjects told Victim B, again at gunpoint, to open the safe. Victim B noted that he/she initially entered the wrong combination. Victim B then heard a sound which he/she recognized as consistent with the racking of a firearm. Once Victim B was able to open the safe, he/she observed the subjects take Victim A's laptop from the safe.

d. While Victim B was being held by the subjects in the Winnetka Residence, Victim A called Victim B's cell phone. The subjects initially hung up but then used Victim B's cell phone to text Victim A to tell Victim A that Victim B was busy.

e. The subjects directed Victim B, still at gunpoint, back to the first floor of the Winnetka Residence. Once he/she was in the living room, one of the subjects pushed Victim B to the ground and held his/her face down. While Victim B was being held by one of the subjects, a child (Victim C), entered the home. Victim B shouted to Victim C to get out and call the police. Victim B bit the subject who was holding him/her and was able to escape from the subjects' control and fled from the Winnetka Residence.

f. Victim B stated that, throughout the robbery, at least one of the subjects maintained control of Victim B either physically and/or at gunpoint. According to Victim B's second interview, which was with both WPD and federal law

5

enforcement, the subjects held him/her at gunpoint the entire time that they were in the Winnetka Residence except for when Victim C arrived, which is when Victim B bit an unarmed subject who had been holding him/her, and ran. Victim B stated that the subjects demanded Victim B's cellphone and the jewelry on Victim B's person, and that Victim B handed over those items to the subjects.

8. On or about March 8, 2026, according to WPD reports, law enforcement interviewed Victim A regarding the armed robbery. According to WPD reports, Victim A provided law enforcement with the following information:

a. On or about March 8, 2026, at approximately 5:25 p.m., Victim A, Victim C, and Victim D arrived at the Winnetka Residence. Victim A informed law enforcement that he/she observed Victim B fleeing the Winnetka Residence through the north exit of the residence while yelling for Victim A to call the police because there were armed individuals inside the Winnetka Residence. While Victim A called the police, he/she observed four of the subjects exit the Winnetka Residence as a black Acura RDX with no license plates (*i.e.*, the **Subject Vehicle**) drove down the driveway. Victim A then observed the subjects enter the **Subject Vehicle** and leave the Winnetka Residence, heading southbound on the street on which the Winnetka Residence is located. Following the armed robbery, Victim A briefly looked around the residence to see what the subjects took. Victim A informed law enforcement that he/she had three Rolex watches and his/her work laptop in the safe, which were all now missing.

9.      According to Victim A, he/she currently owns a cryptocurrency business which is based outside the state of Illinois, but he/she works out of the Winnetka Residence. Victim A further explained that the cryptocurrency associated with the business was associated with the cryptocurrency ledger devices that were stored in the safe located in the Winnetka Residence that the subjects searched. Based on my training and experience, and information I have obtained from other agents with experience in digital currency investigations, I know that cryptocurrency is a digital, not physical, currency, and that transfers of cryptocurrency are conducted via the internet. Thus, for the subjects to have obtained the cryptocurrency that they attempted to steal, they would have had to conduct transactions on the internet to transfer the stolen cryptocurrency to digital wallets that they controlled.

10.      Victim B provided law enforcement with surveillance footage from various cameras around the Winnetka Residence.  Based on my review of the surveillance footage, on or about March 8, 2026, at approximately 4:21 p.m., a black Acura RDX, with black rims, dirt on the sides and rear, a blue sticker in the bottom of the driver's side windshield, bearing no license plate (*i.e.*, the **Subject Vehicle**), pulled into the driveway of the Winnetka Residence and parked near the front door. A short time later, Subject One (later identified as BROWN as described below), wearing black pants, a black hooded sweatshirt, tan sandals, and a black Nike hood, approached the front door carrying a brown Outback Steakhouse bag. Once Victim B answered the door, BROWN asked Victim B if anyone ordered food. Following this, BROWN entered the Winnetka Residence through the front door. Four of the subjects

7

then ran into the Winnetka Residence following BROWN. Subject Two (later identified as JALEN CHAMBERS as described below) can be seen wearing a black hooded sweatshirt, glasses, ripped jeans, and white shoes. Subject Three (later identified as FRANKLIN as described below) can be seen wearing a red hooded sweatshirt, ripped jeans, a black mask, multicolored underwear, and white shoes.

11. As noted above, surveillance footage from the Winnetka Residence showed that Subject Three was wearing distinctively patterned underwear, a red hoodie, jeans, and high top sneakers. According to Chicago Police Department (CPD) records, CPD identified BROWN and FRANKLIN as involved in a traffic stop of a red Chevy Cruze by the CPD on March 7, 2026, at approximately 7:05 p.m. In addition, I have reviewed CPD body worn camera of the stop and identified BROWN and FRANKLIN by comparison to their state identification photos. Body worn camera obtained from CPD officers' stop of FRANKLIN on March 7, 2026, at approximately 7:05 p.m., shows that FRANKLIN was wearing multicolored underwear, a red hooded sweatshirt, ripped jeans, and white sneakers. This clothing appears to be the same as the clothing that Subject Three wore during the March 8, 2026 armed robbery.

12. Based on my review of the video surveillance from the Winnetka Residence, BROWN and a subject wearing a grey hooded sweatshirt, black pants, and black shoes (Subject Four) subsequently exited the residence to move the **Subject Vehicle**, with Subject Four re-entering the Winnetka Residence after doing so. Then, at approximately 5:26 p.m., the **Subject Vehicle** drove down the driveway while four the subjects exited the Winnetka Residence and got in the car. The **Subject Vehicle**

8

then left the residence, making a southbound turn on the same block as the Winnetka Residence.

13.     Based on the above facts, and my training and experience, I know that automobiles, such as the **Subject Vehicle,** and cellular telephones, such as the ones used by the subjects during the kidnapping and robbery, are means, facilities, and instrumentalities of interstate commerce.

> **B.     Recovery of the Subject Vehicle**

14.     On March 11, 2026, law enforcement recovered the **Subject Vehicle** in the area of 602 West Garfield Boulevard, Chicago, Illinois. Specifically, law enforcement observed body damage on the driver's side of the vehicle, as well as a blue Skokie city sticker in the bottom driver's side windshield. This is consistent with the surveillance footage obtained of the **Subject Vehicle** both during and after the March 8, 2026, armed robbery in Winnetka. Additionally, both front windows were broken; these windows were broken when CPD officers attempted to make contact with the **Subject Vehicle's** occupants on March 11, 2026 and the occupants fled in the vehicle. The vehicle's owner was interviewed by law enforcement and identified the **Subject Vehicle** as his/her vehicle, which he had reported was stolen on or about March 2, 2026.

15.     Law enforcement searched the **Subject Vehicle** and the surrounding area of the recovery location, and found, among other items, four latex gloves, a McDonald's receipt from March 11, 2026, at 3:22 a.m., and multiple black plastic vehicle trim pieces.

16.     A review of the McDonald's receipt revealed it is from a McDonald's located at 6515 South Western Avenue, Chicago, Illinois. ATF retrieved surveillance footage from this McDonald's location. A review of the surveillance footage showed that a black 2020 Acura RDX, with a blue sticker in the bottom driver's side windshield, and damage on the driver's side of the vehicle, which appears to be the **Subject Vehicle**, was in the drive through lane on March 11, 2026, at approximately 3:22 a.m.  The surveillance footage shows the vehicle was occupied by an unidentified black male wearing a black Nike brand ski mask and a blue latex glove. Based on the images of the driver of the vehicle, ATF identified that the driver was BROWN. Review of the exterior surveillance camera at the Winnetka Residence shows that the individual who initially knocked on the door and forcibly entered the Winnetka Residence on March 8, 2026 (Subject One), was wearing a hood similar in style to the one in the McDonald's footage. A review of the surveillance footage from the McDonald's, described above, revealed the driver, BROWN, wearing a similar type of mask. ATF obtained surveillance footage from Company A, a rental car company, which depicted an individual, accompanied by BROWN, renting a vehicle on March 13, 2026. In the video footage, BROWN is wearing a Nike pro hood similar in appearance to the hood worn in the McDonald's footage and in the footage from the Winnetka robbery.

### C.     Information Provided by Cooperating Source 1

17.     Cooperating Source 1 (CS1) was detained on March 20, 2026, and advised that he was a subject in a federal felony case for violent offenses. He was

10

advised of his *Miranda* rights and agreed to waive those rights and speak with law enforcement.[2] CS1 subsequently participated in a proffer-protected interview. During those interviews, in summary and not verbatim, CS1 told law enforcement the following:

      a.     CS1 admitted that he was involved in the March 8, 2026 Winnetka robbery described above. He stated that BROWN drove him and three or four other individuals to the Winnetka Residence.[3] While in the **Subject Vehicle,** CS1 heard ISAIAH DUKES's cameraman (Subject Two, later identified as JALEN CHAMBERS) on the phone with ISAIAH DUKES and could hear them speaking about the planned armed robbery.

      b.     Once at the Winnetka Residence, BROWN exited the driver's seat of the **Subject Vehicle**, approached the front door of the Winnetka Residence, and knocked at the door. CS1 explained that BROWN was carrying an Outback

---

[2] CS1 was involved in the **Subject Offenses** and provided information to agents on the day of his arrest in the hopes that such cooperation would result in favorable charging, release, and/or sentencing recommendations by the government. CS1 has prior felony convictions and CS1 is aware that his/her involvement in the violent offenses set forth above violates conditions of court supervision. CS1 has been charged in federal court with commission of the **Subject Offenses**. On March 27, 2026, CS1 provided additional information to law enforcement pursuant to a proffer letter agreement. During that proffer meeting, CS1 initially stated that he did not have a gun when he entered the Winnetka Residence; however, when confronted with screenshots of his entry into the house, he admitted that he did have a gun. Further, CS1 is a convicted felon whose criminal record includes convictions for aggravated unlawful use of weapon and possession of a machine gun. CS1's involvement in the **Subject Offenses** violated his conditions of court supervision. CS1 is cooperating with law enforcement in the hopes that he will receive credit for his cooperation at sentencing.

[3] In a post-arrest interview, KHEILL DUKES acknowledged to being present in the Cadillac Escalade, in area of the robbery at the time of the robbery, but denied knowledge of the robbery. He identified the individuals who entered the Winnetka Residence to include CS1's relative. CS1 did not identify his relative as a participant.

11

Steakhouse bag to pose as a food delivery driver. Once Victim B answered the door, CS1 observed BROWN forcibly entering the residence. CS1, along with three other **Co-Conspirators**, including JALEN CHAMBERS, then followed BROWN into the Winnetka Residence. CS1 admitted to using a pistol during the armed robbery. CS1 identified FRANKLIN as one of the **Co-Conspirators** who participated in the robbery.

      c.     Once inside the Winnetka Residence, CS1 could hear that JALEN CHAMBERS was on a three-way call with ISAIAH DUKES and an unknown male (Subject Seven). CS1 heard both ISAIAH DUKES and Subject Seven providing instructions to JALEN CHAMBERS regarding the cryptocurrency. In a later, proffer-protected interview on March 27, 2026, CS1 positively identified ISAIAH DUKES and JALEN CHAMBERS[4] by photograph. CS1 noted that he grew up around ISAIAH DUKES and recognized his voice. Further, CS1 stated that he could hear JALEN CHAMBERS saying the name "Zayy" while on the phone. CS1 knows that ISAIAH DUKES goes by the nickname "Zayy."

      d.     When Victim B escaped from the house, CS1, JALEN CHAMBERS, and two of the other **Co-Conspirators** all ran to the **Subject Vehicle** and fled. Once they made their escape, they met up with ISAIAH DUKES, RAMSEY, and other associates of ISIAH DUKES.[5] According to CS1, ISAIAH DUKES and RAMSEY stated that they were in the area of the Winnetka Residence and watching

---

[4] CS1 did not know CHAMBERS's name but identified him as ISAIAH DUKES's cameraman.

[5] CS1 identified RAMSEY by photograph.

12

during the armed robbery. CS1 stated that ISAIAH DUKES and RAMSEY had a Cadillac Escalade V when they met. According to CS1, ISAIAH DUKES and RAMSEY were angry at the other **Co-Conspirators** because the armed robbery did not go as planned. RAMSEY and other unknown individuals then searched CS1 and others for any proceeds of the armed robbery, but did not find any because JALEN CHAMBERS, who was not searched, had all of the proceeds. In the March 27 interview, CS1 related that, in addition to ISAIAH DUKES and RAMSEY, an individual he knew as "Big Folks" (later identified as KHIELL DUKES) was also present for the post-robbery meeting. Law enforcement showed CS1 an unlabeled photograph of KHIELL DUKES and CS1 positively identified KHIELL DUKES as the individual he knew as "Big Folks."

18. During the March 27 interview, CS1 also explained that both ISAIAH DUKES and KHIELL DUKES were involved in planning the robbery, including by putting up some of the money used to buy the stolen vehicle used by the offenders. **Subject Phone 4** (KHEILL DUKES's phone, as described below) is a saved contact in CS1's phone under the name "Bigfolks New Line," which CS1 identified as belonging to "Big Folks" (*i.e.*, KHIELL DUKES). A review of CS1's phone revealed that, on or about March 7, 2026, a contact named "Bigfolks New Line," with the phone number for **Subject Phone 4**, and who CS1 identified as "Big Folks" (*i.e.*, KHIELL DUKES), sent a message saying, "Who got hot cars man." Based on my training and experience, I know that "hot cars" means stolen cars. Later in this group chat, the same contact (*i.e.*, **Subject Phone 4**) sent a message saying, "Money sent to them for

13

the car where they at [nickname redacted]." Further, this same contact said, "We got a play to hit like mm we gotta go."

**D.     ISAIAH DUKES, KHIELL DUKES, JALEN CHAMBERS, AND OTHER SUBJECTS TRAVELED FROM ELGIN TO WINNETKA ON MARCH 8, 2026**

19.     As set forth in more detail below, text messages, surveillance footage, and telephone location information show that ISAIAH DUKES, KHIELL DUKES, and RAMSEY traveled together on the afternoon of March 8, 2026 from a hotel in Elgin, Illinois, to the area of the Winnetka Residence and were present in the area during the robbery and kidnapping.

20.     A review of CS1's phone revealed text message exchanges on or about March 8, 2026, between CS1 and a contact named "Fatmann♠." Following his March 20, 2026 arrest, CS1 admitted that "Fatmann♠" was RAMSEY. The contact named "Fatmann♠" was associated with telephone number (872) XXX-8772. A query of a commercial database used by law enforcement revealed that RAMSEY is associated with the telephone (872) XXX-8772 (hereinafter, "RAMSEY's Phone"). On March 20, 2026, RAMSEY, BROWN, and two other individuals were found during the execution of a search warrant on a residence on the 12000 block of South Wallace, Chicago, following a police chase.[6] During the search, law enforcement found an iPhone in a

_____

[6] On March 20, 2026, according to information received from the Northbrook Police Department (NPD), officers responded to a 911 call reporting Victim F was struck in the head with a firearm at a residence in Northbrook. Upon arriving, NPD officers spoke with Victim F, who related that two armed men forcibly entered his/her home and attempted to rob him/her. The men beat Victim F with a firearm. According to a review of video surveillance from a nearby exterior surveillance camera, the men fled the residence in a white Acura sedan ("Subject Vehicle 2"). Law enforcement from various agencies located Subject Vehicle

blue case, which was wrapped in T-shirts and found in the house within a box of white T-shirts. When law enforcement called the telephone number (872) XXX-8772 (RAMSEY's Phone), they observed the iPhone with the blue case, found in the residence on Wallace, as described above, receive a call.

21. CS1 and RAMSEY exchanged multiple text messages on the day of the robbery. For instance, on or about March 8, 2026, at approximately 4:08 a.m., CS1 and RAMSEY texted regarding a key to a "v," which CS1 explained referred to an Escalade V:

RAMSEY:     Who got the key to v

CS1:            Me and [nickname redacted]

                 He still with me

RAMSEY:     Bet

                 We popping out early

                 Dont gts

CS1:            Ight

RAMSEY:     Bwt

---

2 traveling southbound on Interstate 94 near 111th Street in Chicago, Illinois, and pursued Subject Vehicle 2 until it stopped in the area of a residence located on the 12000 block of South Wallace Street, Chicago, Illinois. Law enforcement observed four black males, wearing all black, exit the vehicle and run into the residence. Law enforcement subsequently surrounded the residence and demanded the occupants to come out. A short time later, only CS1 exited the residence. No one entered the residence. Later on March 20, 2026, law enforcement executed a state search warrant on the residence. Law enforcement officers executing the warrant found BROWN, RAMSEY, and two other males in the residence.

22.     Also, on or about March 8, 2026, at approximately 12:07 p.m., CS1 and RAMSEY exchanged text messages regarding RAMSEY's location, as set forth below:

CS1:        Send the lo rn

RAMSEY:    Look at my location

            495 Airport Rd

            Elgin, IL 60123

            United States

23.     Based on my training and experience, and of other special agents and law enforcement personnel, I know "Send the lo rn" to mean send the location right now.

24.     495 Airport Road is the address of a hotel in Elgin, Illinois. A review of the surveillance footage from the hotel showed that RAMSEY, identified by ATF based on a comparison with RAMSEY's state ID photo, was present at the hotel at approximately 6:01 a.m. on March 8, 2026. Based on my review of the hotel security camera footage, Individual A can be seen at the front desk with ISAIAH DUKES and KHIELL DUKES at approximately 5:42 a.m.  Video footage from the Elgin hotel also shows a black man with an afro, wearing glasses, a black shirt, ripped jeans, and white shoes (matching the appearance of JALEN CHAMBERS) was also present at the hotel at approximately 6:02 a.m. on March 8, 2026. An individual matching the

16

same description can be seen on surveillance footage from the Winnetka Residence around the time of the robbery on March 8, 2026.[7]

25. Video footage from the hotel also shows RAMSEY, ISAIAH DUKES, and KHIELL DUKES in the lobby of the hotel at approximately 1:00 p.m. Shortly thereafter, RAMSEY, ISAIAH DUKES, KHIELL DUKES, JALEN CHAMBERS, and other unknown individuals enter a Cadillac Escalade ESV ("**Subject Vehicle 3**") that, shortly after, can be seen leaving the hotel.

26. On March 8, 2026, at approximately 3:29 p.m., RAMSEY and CS1 exchanged the following text messages:

RAMSEY: Forest Way Dr.
Winnetka, IL 60093
United States

RAMSEY: Forest Way Dr
Winnetka, IL 60093
United States

CS1: Onnna way shit 40 minutes

RAMSEY: 1770 Tower Rd
Northfield, IL 60093
United States

27. According to a Google Maps search, Forest Way Drive, Winnetka, Illinois, is an approximately 5-minute drive from the Winnetka Residence. Additionally, based on my training and experience, and of other special agents and

---

[7] Using both sets of surveillance footage (from the hotel and the Winnetka Residence), and a comparison with his Illinois Secretary of State identification photo, ATF identified the individual in the videos as JALEN CHAMBERS. CS1 also identified photographs of JALEN CHAMBERS that were taken from the two sets of surveillance footage.

law enforcement personnel, I understand "Onnna way shit 40 minutes" to mean CS1 was approximately 40 minutes from the address RAMSEY sent him. Further, according to a Google Maps search, 1770 Tower Road, Northfield, Illinois, is also an approximately 5-minute drive from the Winnetka Residence. As discussed above, based on the surveillance footage video, **Co-Conspirators** arrived at the Winnetka Residence at approximately 4:21 p.m., a little less than an hour after RAMSEY sent the above messages.

28. A query of License Plate Reader (LPR) cameras reveals **Subject Vehicle 3**, after leaving the hotel in Elgin, was in the area of the Winnetka Residence before and during the March 8, 2026 armed robbery. Specifically, **Subject Vehicle 3** was seen in the following locations:

a. March 8, 2026, at approximately 3:16 p.m., **Subject Vehicle 3** was observed near the intersection of Willow Road and Hibbard Road, Winnetka, Illinois.

b. March 8, 2026, at approximately 4:38 p.m., **Subject Vehicle 3** was observed near the intersection of Willow Road and Interstate 94, Northfield, Illinois.

29. Based upon a review of the data obtained, via search warrant, from the cellular provider AT&T, RAMSEY's Phone was located near the following areas prior to and during the March 8, 2026, robbery of the Winnetka Residence, all of which are within an approximately 2.5 mile radius of the Winnetka Residence:

18

a. On March 8, 2026, at approximately 3:59 p.m., RAMSEY's Phone was near a cell tower located near the intersection of Willow Road and Interstate 94, Northfield, Illinois.

b. On March 8, 2026, at approximately 4:09 p.m., RAMSEY's Phone was near a cell tower located near the intersection of Tower Drive and Forest Way Drive, Winnetka, Illinois.

c. On March 8, 2026, at approximately 4:43 p.m., RAMSEY's Phone was near a cell tower located near the Winnetka Residence.

30. Based upon a review of location data obtained, pursuant to a search warrant, from the cellular provider T-Mobile, **Subject Phone 3**, used by ISAIAH DUKES, was near a cell tower located near the Winnetka Residence on or about March 8, 2026, at approximately 4:17 p.m., 4:18 p.m., and 4:19 p.m., which is consistent with the time period immediately preceding the armed home invasion.[8]

31. Based upon a review of location data obtained, pursuant to a search warrant from the cellular provider AT&T, **Subject Phone 4**, used by KHIELL

---

[8] **Subject Phone 3** was identified as belonging to ISAIAH DUKES based on the fact that **Subject Phone 3** was found during the April 10, 2026 search of a residence in Elgin, Illinois, where ISAIAH DUKES also was present. Additionally, on or about March 23, 2026, RAMSEY, FRANKLIN, and BROWN were charged by criminal complaint. Following RAMSEY's arrest, he was detained pending a detention hearing. A review of RAMSEY's jail calls revealed that, during a call with another individual, RAMSEY instructed the individual to call his brother and provided **Subject Phone 3**'s phone number. A review of the Instagram account "lilzayosama" revealed that, on or about March 28, 2026, ISAIAH DUKES posted a photo of RAMSEY with the caption "Hbd brudda…". Based on my training and experience, I know that "Hbd brudda" means "happy birthday brother," indicating that RAMSEY is ISAIAH DUKES' brother. Further, CS1 identified ISAIAH DUKES as RAMSEY's brother. A review of CS1's phone also revealed a contact named "Zayy" with the same phone number for **Subject Phone 3** and CS1 told law enforcement that ISAIAH DUKES goes by "Zayy".

19

DUKES (referenced in paragraphs 18 above and 36 below), was near a cell tower located near (within 2.5 miles of) the Winnetka Residence on or about March 8, 2026, at approximately 4:00 p.m. and 4:10 p.m, which is consistent with the time period immediately preceding the armed home invasion.

32. Based upon a review of location data obtained, pursuant to a search warrant from the cellular provider Verizon, **Subject Phone 5**, used by JALEN CHAMBERS, [9] was near a cell tower located near the Winnetka Residence on or about March 8, 2026, at approximately 4:17 p.m., 4:25 p.m., and 5:30 p.m., which is consistent with the time period before, during, and after the armed home invasion.

**E. ISAIAH DUKES, KHIELL DUKES, AND RAMSEY COMMUNICATED WITH THE CO-CONSPIRATORS IN THE WINNETKA RESIDENCE, INCLUDING JALEN CHAMBERS, REGARDING THE CRYPTOCURRENCY**

33. A review of phone records reveals that ISAIAH DUKES and KHIELL DUKES had multiple contacts with the some of the **Co-Conspirators** inside the Winnetka Residence during the armed home invasion.

34. For example, based on a review of the records from T-Mobile, on March 8, 2026, at approximately 4:27 p.m., **Subject Phone 3** (used by ISAIAH DUKES) was on a call with a phone used by JALEN CHAMBERS (**Subject Phone 5**) while located near a cell tower near the Winnetka Residence. This phone data is consistent with

---

[9] JALEN CHAMBERS is identified as the user of **Subject Phone 5** based on the fact that, on January 25, 2026, JALEN CHAMBERS reported **Subject Phone 5** as his telephone number when he was arrested by a police department in Illinois. Additionally, phone records for **Subject Phone 5** show that the subscriber for the number associated with **Subject Phone 5** is subscribed to [first name redacted] CHAMBERS.

CS1's statements that ISAIAH DUKES and JALEN CHAMBERS were in telephone contact during the robbery and kidnapping, as described in more detail in paragraph 17(a), above.

35.     Additionally, based on the records from Verizon, on March 8, 2026, at approximately 4:48 p.m., **Subject Phone 5** (used by JALEN CHAMBERS) attempted to call **Subject Phone 4** (used by KHIELL DUKES), while located near a cell tower near the Winnetka Residence. According to the records obtained from AT&T, on March 8, 2026, at approximately 4:47 p.m., **Subject Phone 4** (used by KHIELL DUKES), while located near a cell tower near the Winnetka Residence,  received a phone call from the phone number 312-697-9027[10], which, according to Venmo records reviewed by law enforcement, is associated with a Paypal account with username "[redacted]" which matches the name of an individual that CS1 identified during his March 27, 2026 proffer as one of the five robbers of the Winnetka Residence.

36.     On April 10, 2026, law enforcement searched a residence on Wolff Road in Elgin, Illinois, pursuant to a search warrant. ISAIAH DUKES, KHIELL DUKES, JALEN CHAMBERS, and at least 5 other individuals were present in the Wolff Road residence at the time of the search. During the search, law enforcement found the following:

a.     **Subject Phone 3** (used by ISAIAH DUKES), located in what appeared to be a home office. During a post-arrest interview, after being advised of

---

[10] A prior affidavit inadvertently stated that **Subject Phone 5**, rather than **Subject Phone 4**, received a phone call from the phone number 312-697-9027.

his *Miranda* rights, ISAIAH DUKES stated, in sum and substance, that Subject Phone 3 belonged to him.[11]

        b.    **Subject Phone 4** (used by KHIELL DUKES), located in a second-floor bedroom that also contained, among other things, a plane ticket in KHIELL DUKES' name for an April 1, 2026 flight from Fort Lauderdale, Florida, to Chicago, Illinois. During a post-arrest interview, after being advised of his *Miranda* rights, KHIELL DUKES stated, in sum and substance, that **Subject Phone 4** belonged to him.

---

[11] ISAIAH DUKES later claimed that other people also used **Subject Phone 3**.

## II. CONCLUSION

37. Based on the above information, I submit that there is probable cause to believe that on or about March 8, 2026, ISAIAH DUKES, KHEILL DUKES and JALEN CHAMBERS conspired, with each other and with other co-conspirators, to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a), and kidnapping, in violation of Title 18, United States Code, Section 1201(c). I therefore respectfully request that this Court issue warrants for the arrests of ISAIAH DUKES, KHEILL DUKES, and JALEN CHAMBERS for violations of Title 18, United States Code, Sections 1201(c) and 1951(a).

FURTHER AFFIANT SAYETH NOT.

JON MOLIDOR
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone April 12, 2026.

Honorable YOUNG B. KIM
United States Magistrate Judge

23